UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
COURT FILE NO.: _____

| | |
|---|---|
| Barbara Jean Hum,<br><br>          Plaintiff,<br>v.<br><br>Citizens Financial Group, Inc., and HSBC Bank USA, N.A.,<br><br>          Defendants. | **COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## INTRODUCTION

1. This action arises out of Defendants' violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.* ("FCRA").

## JURISDICTION

2. Jurisdiction of this Court is proper pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681.

3. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because the conduct at issue occurred in this District, Plaintiff resides in this District, and Defendants conduct business in this District. See *Ford Motor Co. vs. Montana Eighth Judicial District Court*, 2021 WL 1132515 (U.S. March 25, 2021).

## PARTIES

4. Plaintiff, Barbara Jean Hum (hereinafter "Plaintiff"), is a natural person who resides in the County of Hennepin, State of Minnesota, and is a "consumer" as that term is defined by 15 U.S.C. § 1681a(c).

1

5.  Defendant Citizens Financial Group, Inc. (hereinafter "Defendant Citizens"), is a national bank that conducts business in the State of Minnesota.

6.  Defendant Citizens has a principal place of business located at One Citizens Plaza, Providence, Rhode Island 02903.

7.  Defendant Citizens is a "person" as defined in 15 U.S.C. § 1681a(b) and a "furnisher" of consumer information pursuant to 15 U.S.C. § 1681s-2(b).

8.  Defendant HSBC Bank USA, N.A (hereinafter "Defendant HSBC"), is a national bank that conducts business in the State of Minnesota.

9.  Defendant HSBC has a principal place of business located at 452 Fifth Avenue, New York, New York 10018.

10. Defendant Citizens is a "person" as defined in 15 U.S.C. § 1681a(b) and a "furnisher" of consumer information pursuant to 15 U.S.C. § 1681s-2(b).

## PURPOSE OF THE FAIR CREDIT REPORTING ACT

11. Consumer credit plays a major role in the lives of American consumers entering into the American marketplace and the economic system in general. Fair and accurate credit reporting acts as a gatekeeper to credit purchases, employment and income, basic commercial services, insurance coverage, housing rentals, and a broad range of other transactions. Robert J. Hobbs & Stephen Gardner, THE PRACTICE OF CONSUMER LAW 39-40 (2nd ed. 2006).

12. Congress investigated and determined that the banking system is dependent upon fair and accurate reporting, that inaccurate credit reports directly impair the efficiency of the banking system, and that unfair credit reporting methods

2

undermine the public confidence, which is essential to the continued functioning of the banking system. 15 U.S.C. § 1681(a)(1).

13. The FCRA was created to "ensure fair and accurate credit reporting, promote efficiency, and protect consumer privacy." *Safeco Ins. Co. of America v. Burr*, 551 U.S. 47, 52 (2007).

14. The FCRA was proposed in 1968 as an amendment to the original Truth in Lending Act. Senator Proxmire (D-WI) announced his intention to create legislation addressing the growing frequency of cases in which a consumer "is unjustly denied because of *faults or incomplete information in a credit report*," and entered an initial draft of what would eventually become the FCRA into the Congressional Record. Anthony Rodriguez et al., FAIR CREDIT REPORTING 8 (5th ed. 2002) (citing 114 Cong. Rec. 24904 (Aug. 2, 1968)) (emphasis added).

15. Senator Proxmire listed five types of abuses requiring Congressional response, including biased or one-sided information and incomplete information. Anthony Rodriguez et al., FAIR CREDIT REPORTING 8 (5th ed. 2002) (citing 115 Cong. Rec. 2411 (Jan. 31, 1969)).

16. Congress considered inaccurate and misleading information to be the most serious problem. Anthony Rodriguez et al., FAIR CREDIT REPORTING 10 (5th ed. 2002).

17. The FCRA applies to situations in which information relevant to a consumer's "credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living" is collected. Anthony Rodriguez et al., FAIR CREDIT REPORTING 5 (5th ed. 2002) (citing 15 U.S.C. § 1681a(d)).

3

18. An inaccurate or misleading credit report can not only significantly and unfairly lower a consumer's credit worthiness but can also prevent consumers from full access to the American marketplace and negatively impact a consumer's living standard and general reputation on the whole if a consumer's character and mode of living is not accurately portrayed. Congress enacted the FCRA to prevent this arbitrary and iniquitous result.

19. Furthermore, in 1996, Congress, in an effort to increase the "accuracy and integrity" of information supplied to credit reporting agencies, added 15 U.S.C. § 1681s-2 to the FCRA by passing the Consumer Credit Reform Act. The provision, "[r]esponsibilities of furnishers of information to consumer reporting agencies," subjected data furnishers, who were not previously covered by the FCRA, to requirements related to accuracy and the handling of consumer disputes. These provisions were originally scheduled to sunset in 2003 but were considered important enough to Congress to be made permanent in the Fair and Accurate Credit Transactions Act of 2003. Federal Trade Commission Staff: 40 Years of Experience with the Fair Credit Reporting Act, pp. 1, 2, 92. Retrieved from the FTC website: http://www.ftc.gov/os/2011/07/110720fcrareport.pdf.

20. The credit industry has constructed a method of numeric-alpha codes for considering consumer credit report disputes. *See* 15 U.S.C. § 1681i(a)(5)(D).

21. Consumer reporting agencies Equifax, Experian, Trans Union, and Innovis have thus created the Online Solution for Complete and Accurate Reporting, or e-OSCAR, as the credit industries' standard of performance. e-OSCAR allows data

4

furnishers to create and respond to disputes initiated by consumers by routing credit reporting agency-created prompts for automated consumer dispute verifications to the appropriate data furnishers. e-OSCAR utilizes a numeric-alpha language specific to the credit reporting industry.

22. That lexicon or unique language is commonly referred to in the credit reporting industry as "Metro II." It is also known industry wide as the CDIA's "Credit Reporting Resource Guide."

23. Metro II is driven by numeric codes that translate into specific alpha representations about consumers' creditworthiness and character that will ultimately appear on credit reports issued to third parties who make credit, insurance, rental, and employment decisions regarding consumers.

24. Metro II codes are used on an industry wide form known within the credit industry as an Automated Credit Dispute Verification ("ACDV") electronic form.

25. The ACDVs have many fields in their body for use in effecting thorough and complete communications between data furnishers and the credit reporting agencies.

26. These ACDV "fields" have various titles for the many substantive areas into which the Metro II codes can be entered.

## FACTUAL ALLEGATIONS

27. Between October 2016, and February 14, 2019, Robert A. Erikson ("Erikson") lived with Plaintiff and during that time, Erikson illegally used social security number, bank

5

account numbers, credit card numbers, and other confidential personal information from Plaintiff and other members of her family.

28. In or about May 2018, Erikson used Plaintiff's personal information without her knowledge or consent to open a credit card account with Defendant HSBC, account number 521332458731XXXX.

29. Erikson used this fraudulent account with Defendant HSBC to charge approximately $590.

30. Sometime between October 2016 and February 2019, Erikson used Plaintiff's personal information without her knowledge or consent to open a credit card account with Defendant Citizens, account number 524038001331XXXX.

31. Erikson used this fraudulent account with Defendant Citizens to obtain funds which, with accrued interest, reached a balance of over $7,000 by February 2019.

32. On or about February 14, 2019 Erikson moved out of Plaintiff's home and ceased contact with Plaintiff.

33. Shortly thereafter, Plaintiff obtained a copy of her credit reports and discovered that Erikson had opened numerous financial accounts—including the accounts in question—and incurred thousands of dollars in Plaintiff's name.

### PLAINTIFF'S FEBRUARY 2019 CITIZENS DIRECT DISPUTE

34. On or about February 24, 2019, Plaintiff called Defendant Citizens at 1-203-551-7270 and spoke with Defendant's representative, Tasha.

35. Plaintiff explained to Tasha that the Citizens account was fraudulently opened in her name and she was disputing ownership of the account.

6

36. Defendant Citizens claimed it was investigating Plaintiff's claims of fraud, but continued furnishing information to the credit reporting agencies.

## PLAINTIFF'S HSBC DIRECT DISPUTES

37. On or about March 6, 2019, Plaintiff called Defendant HSBC at 1-888-385-8916. Plaintiff spoke with Defendant's representative, Clara.

38. Plaintiff explained to Clara that the account was fraudulently opened in her name.

39. On or about March 25, 2019, Plaintiff sent a copy of her Identity Theft Affidavit to Defendant HSBC.

40. On or about December 16, 2019, Plaintiff sent a letter to Defendant Citizens which stated in relevant part:

"This is in regards to Credit card account 5240380013310078 with outstanding balance of $7431.32. I have never and in this case did not open a Credit Card with Citizens bank, I am a victim of ID Theft and am again including my ID Theft packet and most recent Police Letter with update into their investigation against the person responsible for this act. I would like this account and entire balance removed from my Credit Reports as I did not make any purchases connected with this account."

41. Plaintiff's letter included a notarized identity theft affidavit signed by Maple Grove Police Detective Angela Tschida that indicated that a police report had been filed. Plaintiff's letter also included a letter from Detective Tschida dated October 8, 2019, which stated in relevant part:

7

> "I am conducting an ongoing investigation into the fraud and identity theft of victims Douglas and Barbara Hum and Raechel Hum Thorson. My investigation has revealed that the suspect, Robert Erikson, opened numerous fraudulent accounts in the names of the victims. Due to the scope of this case, my investigation has taken longer than expected. I do anticipate submitting the case to the Hennepin County Attorney's Office for charging. When contacted, Mr. Erikson stated that he had a traumatic brain injury and has no memory of the last eight years.

> "Please feel free to contact me with any questions or concerns."

42. On or about January 16, 2020, Plaintiff received a letter from Defendant Citizens which stated:

> "We are contacting you regarding your recent inquiry about the fraudulent opening of an account associated with your name and personal information. After review, we are denying your claim regarding the account ending in 0078.

> If you should have any questions about this matter, do not hesitate to call us during our normal business hours at 1-888-300-4822, Monday through Friday from 8 a.m. to 5 p.m. EST."

**PLAINTIFF'S DISPUTES TO THE CREDIT REPORTING AGENCIES**

43. In or about July 2020, Plaintiff contacted Experian by telephone to dispute the account with Defendant Citizens, which had been fraudulently opened in her name. She explained that she had been the victim of identity theft and that she had filed a report with the Maple Grove Police Department. Plaintiff provided multiple forms of identification.

44. Thereafter Experian forwarded Plaintiff's dispute information to Defendant Citizens for investigation as required by 15 U.S.C. § 1681i(a)(2).

45. On or about August 7, 2020, Experian responded with a letter stating that regarding the account with Defendant Citizens, "IF ACCOUNT WAS OPENED AS A RESULT OF IDENTITY THEFT, THE CREDIT GRANTOR MAY NOT KNOW HOW TO CONTACT YOU TO DISCUSS THIS MATTER. THE CREDIT GRANTOR REQUESTS THAT YOU CONTACT THEM DIRECTLY."

46. Contrary to the Experian response, Defendant Citizens knew or should have known how to contact Plaintiff, as she had previously called and sent letters to Defendant Citizens directly regarding the identity theft and violated 15 U.S.C. §1681s-2(b) when it verified the account belonged to Plaintiff and additionally failed to update the account to show it was "disputed".

47. On September 4, 2020, per Experian's instructions and Defendant Citizens' request, Plaintiff called Defendant Citizens and explained that she was the victim of identity theft and asked it to cease reporting the fraudulent account. She explained that she had

by this time sent several copies of her identity theft affidavit to Experian and the other CRAs, and that the tradeline for Citizens had been removed from her TransUnion and Equifax reports.

48. On September 29, 2020, Plaintiff again called Defendant Citizens to request it cease reporting the fraudulent account.

49. As of September 28, 2020, Plaintiff's Experian credit report still included the information from Defendant Citizens.

50. Defendant Citizens incorrectly verified for Experian that account number 524038001331XXXX belonged to Plaintiff and was accurately reporting on her credit report, in violation of 15 U.S.C. § 1681s-2(b). Defendant Citizens' reporting adversely affected Plaintiff's credit profile.

51. On or about September 4, 2020, Plaintiff sent a dispute letter to Experian, which stated, in relevant part:

> "There is a serious error on my credit report that must be corrected as it is causing me problems on obtaining credit and is negatively affecting my credit score.

> "The trade line referencing an account with HSBC, account number #521332458731 referencing a balance owed in February 2019 in the amount of $774.00 is inaccurate.

"Specifically, I do not owe any of the above amount on these accounts. I am a victim of identity theft. The information listed above, which appears on my credit report, does not relate to any transactions that I have made. It is the result of identity theft. This account was fraudulently opened in my name. I have attached to this letter a copy of an Identity Theft Affidavit and a Police Report filed with the Maple Grove Police Department. I am also including Maple Grove Police Detective update letters on compiling evident to bring charges against identified individual who committed the Fraud against me. See letters dated for April 25, 2020, November 9, 2019, and an April 25, 2019 letter from Detective Angela Tschida of the Maple Grove Police Department.

\*\*\*

"Per your request, I am also attaching 2 forms of identification to show proof of identity. I respectfully request that you remove any and all Trade Lines noted above on my Experian report be removed and my status updated to show no Fraud or incorrect trade lines.

"If you have any further questions or need additional documentation, please do not hesitate to call me."

52. Thereafter Experian forwarded Plaintiff's dispute information to Defendant HSBC for investigation as required by 15 U.S.C. § 1681i(a)(2).

53. On or about September 28, 2020, Plaintiff received a response from Experian, stating that the fraudulent tradeline would remain on the account. Specifically, it stated that Defendant HSBC "has certified to Experian that the information is accurate."

54. Defendant HSBC failed to conduct a reasonable investigation into the account, in violation of 15 U.S.C. §1681s-2(b) and verified the account as belonging to Plaintiff and failed to update the tradeline as disputed.

## PLAINTIFF'S DAMAGES

55. As a result of Defendants' inaccurate furnishing/reporting, Plaintiff has suffered reduced credit score and profile, emotional distress, frustration, and anxiety constituting actual damages pursuant to 15 U.S.C. § 1681o(a)(1) and § 1681n.

56. Plaintiff is entitled to attorney's fees and costs from Defendant pursuant to 15 U.S.C. § 1681o(a)(2) and § 1681n.

## RESPONDEAT SUPERIOR LIABILITY

57. The acts and omissions of employees and other agents of Defendant(s) who communicated with Plaintiff and/or with the CRAs were committed within the time and space limits of their agency relationship with their principal, Defendant(s).

58. The acts and omissions by these agents were incidental to, or of the same general nature as, the responsibilities these agents were authorized to perform by Defendant(s).

59. By committing these acts and omissions against Plaintiff, these agents were motivated to benefit their principal, Defendant(s).

60. Defendant(s) is/are therefore liable to Plaintiff through the Doctrine of Respondeat Superior for the intentional and negligent acts, errors, and omissions done in violation of federal law by its agents, including but not limited to violations of the FCRA.

## STANDING

61. Standing is proper under Article III of the Constitution of the United States of America because Plaintiff's claims state:

    a. a valid injury in fact;

    b. which is traceable to the conduct of Defendants;

    c. and is likely to be redressed by a favorable judicial decision.

See *Spokeo, Inc. v. Robins,* 136 S. Ct. 1540, 1547 (2016), and *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1992).

62. In order to meet the standard laid out in *Spokeo* and *Lujan*, Plaintiff must clearly allege facts demonstrating all three prongs above.

*The "Injury in Fact" Prong*

63. Plaintiff's injury in fact must be both "concrete" and "particularized" in order to satisfy the requirements of Article III of the Constitution, as laid out in *Spokeo. Id.*

64. For an injury to be "concrete" it must be a *de facto* injury, meaning that it actually exists. In the present case, Defendants' actions negatively impacted Plaintiff's credit.

65. For an injury to be "particularized" means that the injury must "affect the plaintiff in a personal and individual way." *Spokeo*, 136 S. Ct. at 1548. In the instant case, Plaintiff personally suffered worse credit and emotional distress.

*The "Traceable to the Conduct of Defendants" Prong*

66. The second prong required to establish standing at the pleadings phase is that Plaintiff must allege facts to show that Plaintiff's injury is traceable to the conduct of Defendants.

67. In the instant case, this prong is met simply by the facts that the violative conduct contemplated in this Complaint was initiated by Defendants directly, or by Defendants' agents at the direction of Defendants.

*The "Injury is Likely to be Redressed by a Favorable Judicial Opinion" Prong*

68. The third prong to establish standing at the pleadings phase requires Plaintiff to allege facts to show that the injury is likely to be redressed by a favorable judicial opinion.

69. In the present case, Plaintiff's Prayers for Relief include a request for statutory and actual damages. The damages were set by Congress and specifically redress the financial damages suffered by Plaintiff.

70. Furthermore, the award of monetary damages redress the injuries of the past, and prevent further injury by Defendant in the future.

71. Because all standing requirements of Article III of the U.S. Constitution have been met, as laid out in *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016), Plaintiff has standing to sue Defendants on the stated claims.

## TRIAL BY JURY

72. Plaintiff is entitled to and hereby demands a trial by jury. U.S. Const. amend. VII; Fed. R. Civ. P. 38.

## CAUSE OF ACTION

## COUNT I.

## VIOLATIONS OF THE FAIR CREDIT REPORTING ACT – 15 U.S.C. § 1681 *et seq.*

73. Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

74. Defendants violated 15 U.S.C. § 1681s-2(b) by failing to conduct a reasonable investigation with respect to the disputed information, failing to review all relevant information available to it and documentation provided by Plaintiff, and failing to update and/or remove the inaccurate tradeline or, in the alternative, to report the account as "disputed" by changing the Metro II CCC (Compliance Condition Codes) Code to "XB."

75. As a result of Defendants' violations of the FCRA, Plaintiff has suffered actual damages not limited to detriment to her credit rating, emotional distress, embarrassment, mental anguish, and anxiety in an amount to be determined at trial.

76. Defendants' conduct, actions, and inactions were willful, rendering them liable for damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

77. Alternatively, Defendants' violations were negligent, rendering it liable for damages under 15 U.S.C. § 1681o.

15

78. Plaintiff is entitled to recover actual damages, statutory damages, and costs and attorneys' fees from each and every Defendant in an amount to be determined by the Court pursuant to 15 U.S.C. §§ 1681n and 1681o.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that judgment be entered against Defendant for:

- an award of actual and statutory damages against each and every Defendant for its violations of the FCRA pursuant to 15 U.S.C. §§ 1681n and 1681o;
- an award of punitive damages against Defendants for its willful noncompliance with the FCRA pursuant to 15 U.S.C. § 1681n;
- an award of costs and attorney's fees against Defendants pursuant to 15 U.S.C. §§ 1681n and 1681o; and
- such other and further relief as the Court may deem just and proper.

Dated: April 26, 2021

Respectfully submitted,

By: s/Mark L. Vavreck

Mark L. Vavreck, Esq.
Attorney I.D. #: 0318619
**GONKO & VAVRECK PLLC**
Designers Guild Building
401 North Third Street, Suite 640
Minneapolis, MN 55401
Telephone: (612) 659-9500
Email: mvavreck@cgmvlaw.com

Thomas J. Lyons, Jr., Esq.
Attorney I.D. #: 249646
**CONSUMER JUSTICE CENTER, P.A.**
367 Commerce Court
Vadnais Heights, MN 55127
Telephone: (651) 770-9707
Email: tommycjc@ConsumerJusticeCenter.com

*ATTORNEYS FOR PLAINTIFF*

16

## DECLARATION OF COMPLAINT AND CERTIFICATION BY PLAINTIFF

I, Barbara Hum, declare under penalty of perjury, as provided for by the laws of the United States, 28 U.S.C. § 1746, that the following statements are true and correct:

1. I am the Plaintiff in this civil proceeding.
2. I have read the above-entitled civil Complaint prepared by my attorneys and I believe that all of the facts contained in it are true, to the best of my knowledge, information, and belief, formed after reasonable inquiry.
3. I believe that this civil Complaint is well grounded in fact and warranted by existing law or by a good faith argument for the extension, modification, or reversal of existing law.
4. I believe that this civil Complaint is not interposed for any improper purpose, such as to harass Defendants, cause unnecessary delay to Defendants, or create a needless increase in the cost of litigation to Defendants named in the Complaint.
5. I have filed this civil Complaint in good faith and solely for the purposes set forth in it.

*Barbara Hum* (signature)
Barbara Hum